<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THERESA WRIGHT, : : **Plaintiff,** : : v. : : **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY** : : : : **Defendant.** : | Civil Action No. 12-6722 (ES) <br><br> <u>**OPINION**</u> |

<u>**ESTHER SALAS, U.S.D.J.**</u>

      This matter comes before the Court upon the appeal of Theresa Wright ("Plaintiff" or "Wright") from the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff's application for disability benefits under Title II and/or Title XVI of the Social Security Act (the "Act") upon a decision from Administrative Law Judge Barbara Dunn (the "ALJ" or "ALJ Dunn"). This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After carefully reviewing the submissions of both parties, for the reasons expressed herein, the final decision entered by the ALJ is affirmed in part, and remanded for a step three analysis that considers whether the combination of Plaintiff's impairments is medically equal to any listed impairment.

I. **BACKGROUND**

   A. **Procedural History**

Plaintiff filed an application for disability benefits on December 15, 2008 alleging disability as of August 4, 2008. (Tr. 142-143). The application was denied initially, (Tr. 71), and on reconsideration, (Tr. 73-77). A hearing was held on September 19, 2011 before ALJ Dunn. On October 28, 2011, ALJ Dunn issued a decision denying Plaintiff's application. (Tr. 20-35). Plaintiff sought Appeals Council review (Tr. 17-19) and on August 31, 2012, the Appeals Council concluded that there were no grounds for review. (Tr. 4-6). Thereafter, Plaintiff sought relief from the District Court through the instant action.

   B. **Factual History**

   a. **Findings of the Administrative Law Judge**

The relevant findings of the ALJ were as follows: Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012; Plaintiff has not engaged in substantial gainful activity since August 4, 2008, the alleged onset date; Plaintiff has the following severe impairments: obesity, lumbar radiculopathy, lumbar and cervical degenerative disc disease, major depressive disorder, asthma; Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, including any impairment listed in sections 1.00 (musculoskeletal), 3.00 (respiratory) and 12.00 (mental disorders). (Tr. 25-26).

In making the latter determination, the ALJ found that with respect to a musculoskeletal impairment, "[t]he claimant complains of neck and back pain, but the medical imaging does not establish any significant nerve root compromise and the claimant does not show any functional limitations of the severity to meet any of the listing requirements." (Tr. 26). As to a respiratory

impairment, the ALJ found that despite Plaintiff's alleged history of asthma and asthma prescription medications, "no pulmonary tests meet the requirements of listing 3.02 or 3.03." *Id.* In assessing Plaintiff's mental impairment, the ALJ found that Plaintiff only had mild restriction in activities of daily living, mild difficulties in social functioning and "moderate difficulties with regard to concentration, persistence or pace." *Id.*

In terms of future employment capacity, the ALJ further found that Plaintiff has the residual functional capacity (RFC) to perform less than the full range of light work as defined in 20 CFR 404.1567(b).[1] (Tr. 27). The ALJ noted that "the objective medical evidence is consistent with the claimant's complaints of neck and back pain, but does not support the claimant's allegation of total disability." (Tr. 28). The ALJ then referenced the results of Plaintiff's MRI examinations and noted that the "MRI of the lumbar spine in February 2010 showed disc bulging and bilateral facet hypertrophy at L5-S1 with no interval change from the prior study in September 2008." *Id.* The ALJ also noted that after two epidural injections, "claimant reported in December 2008 that she was 75% improved, and rated her pain as only a 2 out of 10." *Id.* The ALJ also pointed out that after the second epidural shot, "[t]here are not records of any further treatment for the claimant's complaints of neck and back pain until January 2010, when the claimant commenced acupuncture." (Tr. 28-29). The treatment notes for acupuncture "continue until April 2010, and after that time there are no medical treatment records of any kind." (Tr. 29).

---

[1] Specifically, the ALJ found that "claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently, can sit for up to six hours in an eight-hour work day and stand or walk up to six hours in an eight-hour work day. The claimant can frequently climb stairs and ramps and balance. The claimant can occasionally climb ropes, ladders and scaffolds and stoop, kneel, crouch, and crawl. The claimant should avoid concentrated exposure to extreme heat and cold, wetness, humidity, and avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. The claimant can execute simple instructions and maintain and sustain concentration, persistence and pace and can relate and adapt in work-like settings." (Tr. 27).

As to Plaintiff's asthma, the ALJ noted that Plaintiff was treated for asthma in March and July of 2008 but not again until January 2010. At that time, Plaintiff's asthma medication prescription was refilled but she "denied any chest pain, shortness of breath or edema." *Id.* The records did not show any treatment for asthma after this time. *Id.* Regarding Plaintiff's depression, the ALJ noted that Plaintiff's "most recent mental status evaluation shows that she has good insight and judgment, some sadness of mood, goal-directed thought processes, intact long and short-term memory and some impaired concentration." *Id.* The ALJ found this to be "consistent with the claimant's allegation of depression but . . . also consistent with the ability to perform work within the above residual functional capacity." *Id.*

As for the opinion evidence, the ALJ noted that "none of the claimant's treating sources have stated that the claimant is unable to work." *Id.* The ALJ then stated she was giving the "greatest weight to the opinions of the state agency medical and psychological consultants" because of the "programmatic expertise" of those physicians and because their opinions are based on a review of Plaintiff's records. *Id.* Overall, the ALJ found the RFC to be supported by "the objective medical evidence, the claimant's treatment history, the claimant's admitted daily activities and the credible opinion evidence." *Id.*

The ALJ also found that Plaintiff is unable to perform any of her past relevant work as either an accountant or customer service representative because she is now only capable of "less than the full range of light work" and the execution of "simple instructions." (Tr. 29). Finally, the ALJ determined that "considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform." (Tr. 30). The vocational expert then testified that given Plaintiff's limitations she could still perform the qualifications of the following occupations: (i)

4

decal applier, (ii) collator and (iii) microfilm mounter. *Id.* Given these findings, the ALJ held that "the claimant has not been under a disability, as defined in the Social Security Act, from August 4, 2008, through the date of this decision (20 CFR 404.1520(g))." (Tr. 31).

      b. **Plaintiff's Testimony**

At the hearing before the ALJ on September 19, 2011, Plaintiff testified that her last employment was doing part-time customer service work for Home Depot in February of 2010. (Tr. 38-39, 46). Previously, Plaintiff had worked as an accountant for insurance companies and earned almost $92,000 from Prudential in 2008. (Tr. 41). Plaintiff testified that she was working for Prudential from home in 2008. (Tr. 41-42). Plaintiff also testified that she was out on disability in 2007 and 2008, and ultimately terminated from Prudential in October 2008, while still out on disability. (Tr. 41-44). Plaintiff stated that her disability was a herniated disc, depression and asthma. (Tr. 41-42). Plaintiff testified that she first started having problems with her back in 2006 and that she had been dealing with asthma "growing up." (Tr. 42). Plaintiff also stated that she was involved in a car accident in 2006 and another one in 2007. (Tr. 61). Plaintiff testified that her height is 5'2" and weight is approximately 256 pounds. (Tr. 53). During the hearing, Plaintiff stated that she took the following medications: Cymbalta, Valium, Advair, Trazodone, Seroquel, Flexeril and Percocet when it is available. (Tr. 49, 56).

When asked whether she thought she could do any of her previous jobs, Plaintiff responded that she could not because of her "poor concentration" and because her hands and legs "don't ambulate like they used to." (Tr. 46). Plaintiff also testified that she gets headaches constantly and does not remember well. (Tr. 46-47). Plaintiff stated that she had been experiencing problems with memory and concentration for about a year. (Tr. 47).

Regarding physical problems, Plaintiff stated that she had been experiencing severe joint pain in her fingers, toes, hips, knees and neck and that no one seemed to know the source of the pain. *Id.* Plaintiff testified that the joint pain started around 2006 or 2007 and that she worked with the pain. (Tr. 48). Plaintiff also stated that she has herniations in her neck and back as well as osteoarthritis and a broken wrist. (Tr. 51). Plaintiff testified that she has received steroid injections in her knees and back and that they have not really helped. (Tr. 54). For her musculoskeletal pains, Plaintiff stated that she sees Dr. Lee and Dr. Anna at Newark Beth Israel Medical Center ("Newark Beth"). (Tr. 54-55). Plaintiff testified that she previously was treated by Dr. Parijo and Dr. Corolla with steroid injections in her back but that she did not see either of them anymore because she does not have insurance. (Tr. 54-55). As for her respiratory issues, Plaintiff stated that she has asthma and bronchitis. (Tr. 51). Plaintiff testified that she experienced an attack of asthma or bronchitis about once a month and either treats it at home with a nebulizer or goes to the emergency room. (Tr. 52).

When questioned about her mental health, Plaintiff responded that she suffers from severe depression and anxiety, experiences panic attacks, and has issues with anger and difficulty focusing. (Tr. 48-49). Plaintiff stated that she has been suffering from depression since 2002 and worked while depressed. (Tr. 49). Plaintiff also testified that she has been and is currently in treatment for her depression. (Tr. 49-50). As to her present treatment, Plaintiff stated that she goes to Newark Beth for both group and one-on-one therapy once a week and sees a psychiatrist once every two months. (Tr. 50). Plaintiff also testified that in February of 2011 she cut her wrists in an alleged suicide attempt and had to go to the emergency room. (Tr. 64-65).

When asked how long she can sit for, Plaintiff responded "no more than two-and-a-half, three hours" until the pain gets severe. (Tr. 52). Plaintiff testified that she experiences sharp

6

pains all over, down her legs and severely in her toes. (Tr. 52). Plaintiff stated that the sharp pains she experiences from sitting for long periods come and go but that the joint pain is constant. (Tr. 52). Plaintiff testified that she can walk no more than a block and stand no longer than an hour. (Tr. 57). Plaintiff also stated that one of her physicians, Dr. Parzio, told her that she could not do any lifting. (Tr. 57-58).

When asked about her living arrangement, Plaintiff stated that she lived with her sister. (Tr. 58). As for an average day, Plaintiff testified that she spends most of the day in bed watching television and sleeping but also tries to straighten up as much as she can. (Tr. 58-59). Plaintiff stated that she falls asleep around 8:30/9:00 p.m. but gets up around 1:30/2:00 a.m. and cannot go back to sleep until around 4:00 a.m. (Tr. 60). Plaintiff also testified that she does not like to socialize and prefers to be by herself. (Tr. 60).

    c. **Medical Evidence**

        i. **Back Injury**

Plaintiff was involved in two car accidents, one in January of 2007, and another on August 4, 2008. (Tr. 290, 326). The results of an MRI performed on March 14, 2007, show that Plaintiff had a "bulging annuli at L4-L5 and L5-S1" as well as a "shallow left lateral herniated disc at L3-L4." (Tr. 219). An MRI performed on September 13, 2008, showed "posterior disc bulging at C5-6," as well as "posterior disc bulging and bilateral facet hypertrophy at L5-S1 level" but "no spinal cord abnormalities." (Tr. 328-329). On September 25, 2008, Plaintiff was diagnosed by Andrew Carolla, M.D., a Board Certified Orthopedic Surgeon, with a sprain/strain of the cervical spine and lumbar, a bulging disc in the cervical spine and lumbar spine as well as lumbar and cervical radiculitis. (Tr. 345-346). On September 18, 2008, Plaintiff's physician,

7

Michael Parziale, M.D., advised that Plaintiff should be "kept out of work for at least two more weeks until October 8." (Tr. 288).

There are records showing that Plaintiff received numerous treatments from a chiropractor between August and October 2008. (Tr. 331-343, 349). Notes from Plaintiff's chiropractic sessions show that Plaintiff reported a "slight improvement in the degree of neck pain" on September 5, 2008 after receiving treatment. (Tr. 332). Plaintiff's chiropractors, Franco Rizzolo, D.C. and Anthony Blake, D.C., explained that Plaintiff's injury of a "C5-6 and L5-S1 disc bulge . . . is the result of a traumatic event which causes the disc to become infiltrated with edematous fluid . . . [and] can cause constant pressure into the spinal nerve roots leading to denervation at that specific segment." (Tr. 352). The chiropractors also noted that Plaintiff "has responded well to the conservative treatment provided by this office" but that her "symptoms can be expected to be constant recurrent" and that her "condition represents a serious permanent injury." (Tr. 352-353).

Plaintiff received a lumbar epidural steroid injection on November 1, 2008. (Tr. 270-271). At a follow-up visit two weeks after the initial injection, Plaintiff reported "definite benefit from the treatment" and rated her pain at "around a 4, down from the 9/10." (Tr. 324). Her physician, Todd Koppel, M.D., assessed that she was "at least 60% improved overall." (Tr. 324). On December 11, 2008, Plaintiff received a second lumbar epidural steroid injection. (Tr. 268-269). Three weeks later, her physician determined she was "overall 70 to 75% improved" and that she "reached maximum medical improvement and therefore requires no further treatment." (Tr. 323).

On February 3, 2010, Plaintiff underwent an additional MRI. (Tr. 319). These images were compared to her previous MRI from September 2008. The reviewing physician reported

8

"posterior disc bulging and bilateral facet hypertrophy at L5-S1 level" and "no appreciable interval change . . . compared to the prior examination of 9/13/2008." (Tr. 319).

Between January and April 2010, reports show that Plaintiff received acupuncture. (Tr. 313-318, 320-322). The treating acupuncturist reported that Plaintiff's pain, muscle spasms and depression/anxiety were all diminishing, and that Plaintiff was progressing fairly and should continue therapy. *Id.* The most recent medical record pertaining to Plaintiff's back injury is a report from an abnormal lumbar needle electromyographic study performed on April 8, 2010. (Tr. 303-306). The treating physician, Jeffrey J. Fossanti, M.D., reported chronic radiculopathy in the Right L5 and Right S1. (Tr. 306).

ii. **Asthma**

On January 11, 2008, Plaintiff was admitted to Mountainside Hospital for chest and back pain. (Tr. 221-243). Plaintiff was diagnosed with pleurisy and chest wall pain and instructed to take ibuprofen and narcotic pain medicine. (Tr. 242). Three other reports from March of 2008 show that Plaintiff was treated for a cough, asthmatic bronchitis and asthma. (Tr. 298-300). Plaintiff was prescribed Advair and Nebulizer treatment. (Tr. 298-300). On January 6, 2010, Plaintiff's albuterol prescription was renewed to treat her asthma. (Tr. 287). The final medical report in the record pertaining to Plaintiff's asthma is a January 7, 2010 radiology report that shows Plaintiff's "lungs are clear." (Tr. 286).

iii. **Depression**

On April 17, 2008, Plaintiff was treated by Dr. Parziale for "continued depression and migraines." (Tr. 294-295). Dr. Parziale noted that Plaintiff had a "one day history of extreme anxiety and crying and depression" and had recently found out "her job [at Prudential] will be terminated" and "recently underwent a separation and/or divorce." (Tr. 294). Dr. Parziale

9

prescribed Imitrex for the migraine and Xanax for the depression and noted that if the depression symptoms continue after reevaluation in several weeks, Plaintiff "will be advised to seek consultation with a psychologist and/or consider an antidepressant." (Tr. 294-295).

On January 29, 2010, Plaintiff had her first appointment with a clinician at Newark Beth. (Tr. 375). The case manager reported that Plaintiff "feels like [she's] 'in a no way out situation'" and "has sleeping problems, tearful, exhausted most of the time." *Id.* In a progress note from February 8, 2010, the clinician noted that Plaintiff scored a 16 on the depression self-rate scale which means she is severely depressed. (Tr. 360). The clinician told Plaintiff how medication would help her deal with her depression and Plaintiff said she would think about it. *Id.* The record includes progress notes and depression group notes from Plaintiff's sessions at Newark Beth between February and April 2010. On April 19, 2010, Dr. Suneeta Chacko-Varkey, M.D., a psychiatrist at Newark Beth, reported that Plaintiff was having a hard time sleeping but otherwise there were "no other problems." (Tr. 355). Dr. Chacko-Varkey noted that Plaintiff had no anxiety or suicidal ideations and that her thought form was goal-directed and her insight and judgment were good. *Id.*

On September 10, 2010, Dr. Herman Huber, a state agency psychologist, evaluated Plaintiff's records and prepared a "Psychiatric Review." (Tr. 376-82). Dr. Huber determined that Plaintiff had a "depressive disorder" and a mild degree of functional limitation in the following areas: "restriction of daily living" and "difficulties in maintaining social functioning." (Tr. 377-78). Dr. Huber also determined that Plaintiff had moderate "difficulties in maintaining concentration, persistence" and no "episodes of decompensation." (Tr. 378). Dr. Huber found that Plaintiff was "moderately limited" in the following areas: (1) "the ability to maintain attention and concentration for extended periods;" (2) "the ability to perform activities within a

10

schedule, maintain regular attendance, and be punctual within customary tolerances;" (3) "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" and (4) "the ability to accept instructions and respond appropriately to criticism from supervisors." (Tr. 379-80). With respect to all other areas in the categories of (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; and (4) adaption, Dr. Huber found that Plaintiff was "not significantly limited." (Tr. 379-80). Overall, Dr. Huber concluded that Plaintiff "is able to execute simple instructions, sustain CPP, relate and adapt in work[-]like settings." (Tr. 380).

On July 26, 2011, Dr. Chacko-Varkey reported that Plaintiff "says she is feeling very dysphoric" and says she is not doing well. (Tr. 403). Dr. Chacko-Varkey advised Plaintiff to continue Cymbalta and to start Seroquel. *Id.* Dr. Chacko-Varkey noted that Plaintiff was experiencing anxiety, her mood was sad, and her concentration was impaired. (Tr. 403-04). Dr. Chacko-Varkey also reported that Plaintiff's behavior was good, her speech was coherent, her thought form was goal-directed and no suicidal ideations were present. (Tr. 403). In addition, Dr. Chacko-Varkey recorded that Plaintiff's insight and judgment were good and her short and long-term memory were intact. (Tr. 403-04). The only other document in the record related to Plaintiff's mental health is a letter from therapist Claire Wooloff dated September 15, 2011, stating that Plaintiff has been attending individual therapy sessions with Ms. Wooloff since May 2011. (Tr. 402).

### iv. General

On May 29, 2009, Dr. Arthur Pirone, a state agency reviewing physician, completed a "Physical Residual Functional Capacity Assessment" related to Plaintiff's cervical and lumbar

disc disease and asthma. (Tr. 274-81). Dr. Pirone assessed that Plaintiff could occasionally lift or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; and had no other restrictions with respect to pushing or pulling. (Tr. 275). With respect to postural limitations, Dr. Pirone determined that Plaintiff could climb ramps and stairs frequently and ladders, rope and scaffolds occasionally. (Tr. 276). Dr. Pirone also concluded that Plaintiff could balance frequently and stoop, kneel, crouch or crawl occasionally. *Id.* As to environmental limitations, Dr. Pirone determined that Plaintiff should "avoid concentrated exposure to extreme cold, extreme heat, wetness and humidity and avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc." (Tr. 278).

In his general assessment, Dr. Pirone noted that Plaintiff's "impairments have responded favorably to treatment." (Tr. 276). Dr. Pirone determined that, based on the "totality of evidence," Plaintiff "has no difficulty standing, walking, sitting, or with use of her upper extremities." *Id.* Dr. Pirone also noted that his determination did not "entirely corroborate [Plaintiff's] allegations regarding pain and functional limitations." *Id.*

## II. STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance." *Woody v. Sec'y of Health & Human Servs*, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather such relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to

support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted). Not all evidence is considered "substantial." For instance:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.,* 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. *Stewart v. Sec'y of Health, Educ. & Welfare,* 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). As such, it does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185. 1190-91 (3d Cir. 1986) (quoting *Hunter Douglas. Inc. v. NLRB,* 804 F.2d 808, 812 (3d Cir. 1986)). "The district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)). A Court must nevertheless "review the evidence in its totality." *Schonewolf v. Callahan*, 972 F.Supp. 277, 284 (D.N.J. 1997) (citing *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)). In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Willibanks v. Sec'v of Health & Human Servs.,* 847 F.2d 301, 303 (6th Cir. 1988)).

To properly review the findings of the ALJ, the court needs access to the ALJ's reasoning. Accordingly,

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is

13

> supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'v of Health. Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).  A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F.Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).  If the ALJ fails to properly indicate why evidence was rejected, the court is not permitted to determine whether the evidence was discredited or simply ignored.  *See Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir. 2000) (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

### III. APPLICABLE LAW

#### a. The Five-step Process

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382.  A claimant is considered disabled under the Social Security Act if he or she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A).  A claimant bears the burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).

To make a disability determination, the Commissioner follows a five-step process pursuant to 20 C.F.R. § 416.920(a).  Under the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 416.920(b). "Substantial gainful activity" is work that involves significant and productive physical or mental duties, and is done (or intended) for pay or profit.  20 C.F.R. § 416.972.  If the claimant

14

establishes that she is not currently engaged in such activity, the Commissioner then determines whether, under step two, the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii).

The severe impairment or combination of impairments must "significantly limit[] [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The impairment or combination of impairments "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909. If the Commissioner finds a severe impairment or combination of impairments, he then proceeds to step three, where he must determine whether the claimant's impairment(s) is equal to or exceeds one of those included in the Listing of Impairments in Appendix 1 of the regulations. 20 C.F.R. § 416.920(a)(4)(iii). Upon such a finding, the claimant is presumed to be disabled and is automatically entitled to benefits. 20 C.F.R. § 416.920(d). If, however, the claimant does not meet this burden, the Commissioner moves to the final two steps.

Step four requires the Commissioner to determine whether the claimant's RFC sufficiently allows her to resume her previous work. 20 C.F.R. § 416.920(a)(4)(iv). If the claimant can return to her previous work, then she is not disabled and therefore cannot obtain benefits. 20 C.F.R. § 416.920(e). If, however, the Commissioner determines that the claimant is unable to return to her prior work, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner, who must find that the claimant can perform other work consistent with her medical impairments, age, education, past work experience and RFC. 20 C.F.R. § 416.920(g). Should the Commissioner fail to meet this burden, the claimant is entitled to social security benefits. 20 C.F.R. § 416.920(a)(4)(v).

### b. The Requirement Of Objective Evidence

Under the Act, disability must be established by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." *Id.* Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

*Id.* Credibility is a significant factor. When examining the record "the adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, *1996 SSR LEXIS 4, 1996 WL 374186* (July 2, 1996). To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. *Id.* The requirement for a finding of credibility is found in 20 C.F.R. § 416.929(c)(4). A claimant's symptoms, then, may be discredited "unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 416.929(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

IV. **DISCUSSION**

    **a. The ALJ properly considered Plaintiff's obesity**

Plaintiff is 5'2" and weighed between 240 and 256 pounds. (Tr. 53, 158, 288-300, 326, 334, 342, 350). Plaintiff takes issue with the fact that after finding obesity to constitute a severe impairment, the ALJ only mentions obesity once.[2] Plaintiff asserts that Social Security Ruling (SSR) 00-3p (2000 WL 628049) required the ALJ to explicitly consider Plaintiff's obesity at every subsequent step of the analysis. However, as Defendant points out, SSR 00-3p was rescinded and superseded by SSR 02-1p over 10 years ago (2002 WL 34686281). Furthermore, SSR 01-2p did not significantly change SSR 00-3p with respect to obesity analysis. SSR 01-2p still instructs adjudicators to consider obesity when evaluating disability "not only under the listings but also when assessing a claim at other steps of the sequential evaluation process." *Id.* at *1. However, SSR 01-2p also cautions adjudicators not to "make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." *Id.* at *6. Thus, adjudicators are reminded to "evaluate each case based on the information in the case record." *Id.*

The Court points out that there are no assessments by physicians or other medical evidence in the record that specifically address Plaintiff's obesity and how it affects her ability to ambulate or function in any other way. Specifically, no doctor opined that Plaintiff's obesity had any effect on Plaintiff's physical, cardiopulmonary or mental functioning. Given the minimal evidence in the record, the Court does not see how the ALJ could have addressed obesity in any

---

[2] "The Court has considered the listings of impairments and concludes that the claimant does not meet the requirement of any impairment listing in sections 1.00 (musculoskeletal) or 3.00 (respiratory). "*In making this determination, the effects of the claimant's obesity have also been considered.*" (Tr. 25-56) (emphasis added).

17

additional detail without making "assumptions about the severity or functional effects of obesity combined with other impairments." 2002 WL 34686281, at *6. As mentioned above, adjudicators are specifically cautioned against making these assumptions by SSR 01-2p. Thus, the Court finds that the ALJ adequately considered Plaintiff's obesity in her analysis.

### b. The ALJ failed to consider Plaintiff's impairments in combination

Defendant asserts that the ALJ, in step three of its evaluation, failed to combine all of Plaintiff's impairments for an analysis of medical equivalence. Although the claimant bears the burden of proving that his impairments meet those listed in Appendix 1, if a claimant's impairment does not meet the requirements of any listing, the ALJ is required to determine whether the combination of impairments is medically equal to any listed impairment. *See Torres v. Comm'r of Soc. Sec.,* 279 Fed. App'x 149, 151 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 120 n. 2 (3d Cir. 2000)); 20 C.F.R. 404.1526(b). Here, the ALJ states that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 25). However, this is the extent of the ALJ's combination analysis. Although the ALJ sufficiently explains why Plaintiff's impairments do not meet the Appendix 1 listings individually, the ALJ does not provide any analysis or explanation as to why Plaintiff's impairments, when considered in combination, fail to equal a listed impairment. As in *Torres*, the ALJ here failed at step three by not considering Plaintiff's impairments in combination and remand is therefore necessary on this issue.

### c. The RFC is supported by substantial evidence

Plaintiff argues that the ALJ erred by not adequately explaining or supporting the RFC finding. Plaintiff complains that the ALJ merely adopted without any explanation the state

18

agency RFC determined by Dr. Pirone, a non-examining state agency reviewing physician.[3] However, the Court points out that Plaintiff bore the burden at this stage of the evaluation and that none of Plaintiff's treating physicians opined about Plaintiff's residual capacity. As the ALJ pointed out, "none of the claimant's treating sources have stated that the claimant is unable to work." (Tr. 29). It is true that the RFC is based largely on Dr. Pirone's assessment. However, as explained by the ALJ, the RFC is also supported by the objective evidence. In addition, there was minimal evidence in the record that the ALJ could have used to otherwise fashion an RFC and no real evidence to the contrary. Given this lack of evidence, it was reasonable for the ALJ to give the "greatest weight to the opinions of the state agency medical and psychological consultants who reviewed the claimant's medical records." (Tr. 29).

When explaining the objective medical evidence, the ALJ described the results of Plaintiff's MRIs and noted that there was "no interval change" between the September 2008 MRI and the February 2010 MRI. (Tr. 28). The ALJ also noted that Plaintiff's neck pain "improved by about 75%" after chiropractic treatments and that after two epidural injections Plaintiff reported that she was "75% improved and rated her pain as only a 2 out of 10." (Tr. 28). After these treatment notes, the ALJ pointed out that there were "no records of any further treatment for the claimant's complaints of neck and back pain until January 2010 when the claimant commenced acupuncture." (Tr. 28-29). The acupuncture continued until April 2010 and, as pointed out by the ALJ, "after that time there are no medical treatments records of any kind." (Tr. 29).

Although Plaintiff complains that the ALJ's reliance on Dr. Pirone's RFC ignores any medical evidence generated after May 29, 2009, the evidence after that date is minimal and only

---

[3] State-agency consultants are "highly qualified physicians and psychologist who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i).

19

continues until April 2010. Plaintiff generalizes about how the ALJ failed to consider "over 100 pages of medical records containing hundreds of medical findings" (Pl.'s Br. at 30), but does not point to any specific evidence that conflicts with the ALJ's RFC determination. Given that the objective evidence shows that Plaintiff's pain had improved after treatment and that there is no evidence from any treating physicians in direct conflict with the RFC, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

## V. CONCLUSION

For the reasons stated above, the final decision entered by ALJ Dunn is affirmed with respect to the obesity analysis and RFC determination. However, the case will be remanded for a step three analysis that considers whether the combination of Plaintiff's impairments is medically equal to any listed impairment. An appropriate Order accompanies this Opinion.

                                                                           *s/Esther Salas*
                                                                          **Esther Salas, U.S.D.J.**